# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

ROOPAL PATEL,

      Plaintiff,             :        Case No. 3:07-cv-243

      -vs-                        Magistrate Judge Michael R. Merz

                               :

WRIGHT STATE UNIVERSITY, et al.,

      Defendants.

## DECISION AND ORDER

This case is before the Court on Plaintiff's and Defendants' Motions for Summary Judgment (Doc. Nos. 29, 34) which are ripe for decision after briefing. The motions were made after completion of discovery satisfactory to both parties.

The parties have unanimously consented to plenary magistrate judge jurisdiction under 28 U.S.C. § 636(c) and the case was referred on that basis.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id.* The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S. Ct. at 2510-11 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F. 2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F. 2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F. 3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States*

*v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S. Ct. at 2510.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F. 2d 606, (6th Cir. 1992), *cert. denied*, 506 U.S. 1054, 113 S. Ct. 979, 122 L.Ed.2d 133 (1993).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

**Statement of Facts**

Defendants provide a narrative statement of relevant facts from the deposition testimony (Doc. No. 34 at 1-14.) Plaintiff has not written a competing narrative in her Memorandum in Opposition, nor has she detailed any disputes of Defendants' presentation of the facts. Neither side has filed any affidavits; both rely on the deposition testimony of Roopal Patel, Robert Rando, Victor McCarley, Christina Waite, and Kathleen Malloy. The Court finds the following uncontested facts:

The Wright State School of Professional Psychology is an academic school within Wright State University. In addition to offering a doctorate in psychology, it also offers a pre-doctoral internship program. Eligible interns include doctoral candidates who have completed all but dissertation requirements in programs conforming with American Psychological Association accreditation criteria in clinical and counseling psychology.

Dr. Victor McCarley is an Associate Professor in the School and has served as the Director of the Pre-Doctoral Internship Program since 2003. (McCarley Dep. 7). As Director, McCarley is responsible for day-to-day governance of the program and also chairs the Internship Training Committee. (McCarley Dep. 8). Dr. Robert Rando is the Director of WSU's Counseling and Wellness Services and an Associate Professor in the School; his duties include the supervision of interns. (Rando Dep. 4-6). He served as the Chair of Patel's Remediation Committee when she was reinstated to the internship program on March 1, 2007. (Rando Dep. 6-7). Dr. Kathleen Malloy is a Professor and a former Co-Director of the Pre-Doctoral Internship Program. (Malloy Dep. 5-6). Malloy served as Patel's supervisor from March 1, 2007, to May 31, 2007, when Patel was removed from the Internship Program. (Malloy Dep. 7-8). John Rudisill was the Dean of the School during Patel's tenure. (McCarley Dep. 49).

Plaintiff Roopal Patel is a 33-year old East Asian of Indian descent. (Patel Dep. 236). She

was graduated from Kalamazoo College in 1997 with a bachelor's degree in business. In the fall of 2000, she enrolled in the doctoral program for clinical psychology at the Chicago School of Professional Psychology to begin work on her Psy.D. (Patel Dep. 21-22). In order to obtain her Psy.D., Patel needs to complete four or five years of instruction from an accredited institution, complete an internship, and write and defend a dissertation. (Patel Dep. 23).

On September 1, 2005, Patel entered the School internship program as a pre-doctoral intern. (Patel Dep. Exhs. 3, 13). As part of the program, an intern must complete a minimum number of direct clinical service hours (clinical rotations) and indirect service hours (teaching and didactic work). (McCarley Dep. Exh. A) For her first rotation, Patel worked under the supervision of Dr. Bruce Ladle at the Rehabilitation Unit Psychology Department of Miami Valley Hospital. (Patel Dep. 35-42). The rotation required Patel to spend four days per week at Miami Valley and one day interacting with other interns on case presentations. (Patel Dep. 76-80).

Ms. Patel admitted some problems with beginning her internship. First, she was late in getting registered with the program. (Patel Dep. 67-72). Later in September 2005, she began to show signs of disorganization and distractibility. (Patel Dep. Exh. 3). According to Patel, she did not experience any further problems during her first rotation. However, Drs. Ladle and McCarley documented concerns with Patel's performance as early as September 23, 2005. (McCarley Dep. Exh. D; Patel Dep. Exh. 2). McCarley was "quite concerned" about Patel's "lateness in getting registered with SOPP," and completing her professional liability coverage and Ohio psychology registration forms. *Id*. He was also concerned that she was absent or reported late to several program site activities, including scheduled orientations. As McCarley explained, "These concerns are considered serious lapses in professional responsibility and judgment, and cannot continue to be tolerated." *Id*.

To assist Ms. Patel with these problems, Dr. McCarley asked her to consult with her home

school training director, Dr. Robin Oatis-Ballew, and Ladle to address "any adjustment concerns that may have surfaced" at Miami Valley. If Patel had any remaining concerns, McCarley was willing to meet with her. McCarley cautioned that the issues would be reviewed during Patel's first formal internship performance evaluation and if not addressed by that time her "continuance in this internship program will be evaluated." *Id.*

Ladle talked with Patel about her performance problems, and "After about 1-2 months of discussing concerns regarding her continued tardiness, disorganization, social inappropriateness at times and lack of planning, the possibility was presented to her about having some possible attentional deficits." (McCarley Dep. Exh. C). Ladle "suggested a number of different types of accommodations/strategies that would help her" and put some guidelines together to help her structure her internship work. *Id.*

On February 27, 2006, Patel received her six-month evaluation.[1] (Patel Dep. Exh. 4). Although Patel received some adequate ratings, she received a number of marginal/problematic and inadequate ratings for her psychological assessment skills and inability to write a clear evaluation. Her reports were untimely and incomplete. *Id.* This resulted in at least one conclusion that Patel was not showing appropriate progress toward being a self-reliant psychologist. *Id.* Ladle described the first six months of her internship as "bumpy." *Id.* Patel did not disagree with the issues and concerns raised in her evaluation. (Patel Dep. 104-06). Patel "marginally, but satisfactorily" completed her Miami Valley Hospital rotation on March 3, 2006. (Patel Dep. Exhs. 8, 13, 40).

Patel was assigned to a second six-month rotation with the General Practice Clinic at the Ellis Institute (GPC) under the supervision of Dr. Stephen Yerian. Patel continued to meet one day a week for intern case presentations under the supervision of Dr. McCarley. (Patel Dep. 117-19).

---

[1]Patel's 3-month performance evaluation, conducted on November 30, 2005, indicated "problematic functioning." (Patel Dep. Exh. 13).

On March 16, 2006, before beginning this rotation, Patel attended a meeting with McCarley, Yerian, and Carol Smart, Ellis Institute Administrative Assistant, where she was placed on probation for 90 days in order to monitor any performance difficulties that might continue from her first rotation. (Patel Dep. 125-30; Patel Dep. Exhs. 3, 5). Patel received weekly feedback from either Yerian and/or McCarley. (Patel Dep. Exh. 8). McCarley told Patel that probation meant that he could ask her to leave the program if, for example, paperwork was not completed or she was absent without leave. *Id*.

Thereafter, Yerian and Patel developed a remedial behavioral plan to govern her time in her second rotation at the Ellis Institute. (Patel Dep. Exhs. 6, 13). The plan consisted of expectations for Patel and directives to maintain a daily schedule, reporting any absences to Yerian in advance.

Roughly halfway through her second rotation, Patel received an interim performance report. (Patel Dep. Exh. 7). The report noted several concerns with attendance and clinical performance. With respect to attendance, Yerian noted that Patel typically showed up five minutes to two and one half hours late for meetings, or was completely absent without reporting. *Id.* With respect to performance, even though she only had a handful of patient assignments, Patel was incapable of noting patient appointments in the GPC log book, and belatedly turned in "client intakes or other chart paperwork on any of the clients she has seen." *Id*. Most seriously, upon review of the patient charts, Yerian discovered that Patel did not make progress notes for any patient sessions, and had not completed daily activity logs or followed proper chart administration procedures in a timely manner. *Id*.

The School suspended Patel's clinical privileges on May 12, 2006, due to her "inability to reasonably man[a]ge client contact without regard to client welfare." (Patel Dep. Exhs. 3, 13). Without patient contact, Patel had one component to focus on – case presentations. On June 28, 2006, Patel gave a case presentation to other interns. *Id.*

The next day McCarley and Yerian met with Patel. (Patel Dep. Exh. 10). At the meeting, Patel acknowledged that she had not been able to manage some of the "problems" she was having. *Id.* She also said she had been reluctant to admit that she had a "problem." McCarley responded that he was unaware of her "problems." (McCarley Dep. 31). Patel admitted that she never told McCarley about her "problems," that is, her attention deficit disorder (ADD) or medication regimen. (Patel Dep. 112, 213). McCarley ended the meeting by informing Patel she was being dismissed from the internship program, a decision he made in consultation with Dr. La Pearl Logan Winfrey, Associate Dean of Clinical Training, and Dr. Rudisill, Dean of Clinical Training. (McCarley Dep. 12, 49). Patel was also informed of her right to appeal her dismissal. (Patel Dep. Exh. 10). Patel was told she was being dismissed due to her: (1) inability to consistently and adequately address organizational and clinical demands, even after remedial efforts were implemented to help facilitate her successful program completion, (2) inability to manage clinical demands, exemplified in part by not being able to follow directions, not being on time for meetings/appointments, not being able to meet time deadlines, and incomplete/missing/late paperwork, and (3) her use of leave time was not documented, and on several occasions her whereabouts were unknown for extended periods during scheduled hours/days. (McCarley Dep. 14, 20-21; McCarley Dep. Exh. B).

Sometime after Patel's May 12, 2006, suspension, Yerian referred her to Dr. Christina Waite for psychiatric services[2]. (Patel Dep. 213; Waite Dep. 17). Waite is a psychiatrist in private practice and a clinical professor at WSU. (Waite Dep. Exh. 1). Patel's initial meeting with Dr. Waite occurred on June 21, 2006. (Waite Dep. 20; Waite Dep. Exhs. 2-3). Prior to this meeting, Patel had never received a formal diagnosis of depression, ADD, ADHD, or any other disorder. (Patel Dep. Exh. 5). However, she explained to Waite that after being at WSU for less than one month her

---

[2]There is no evidence that Dr. Yerian brought any of Ms. Patel's problems which he thought merited a psychiatric referral to the attention of Dr. McCarley or any other School administrator.

internist father, Dilip Patel, "diagnosed" her with ADD without conducting a diagnostic test. (Patel Dep. 49-55, 93-100). Even then, Patel was not prescribed medicine for ADD. Instead, her father provided Patel medication for depression, similar to what he had done in 2003. (Patel Dep. 49-55). Patel recognized that the medicine provided worked only to alleviate depression. (Patel Dep. 49-55, 61-67). In fact, the Adderall her father prescribed caused her nausea, sweating, shaking, and headaches. (Patel Dep. 61-67, 93-100). She admitted the medicine did not, and would not, ameliorate her problems with organization, timeliness, or interpersonal communication, and might have contributed to it. *Id.*

Dr. Waite's notes from the initial intake show that Patel's "problems" were caused as much, if not completely, by the substances and medications she consumed. (Waite Dep. Exh. 3). Patel's "main problem" was overstimulation from being prescribed a dose of Effexor above the APA recommended dose. (Waite Dep. 49). Patel took 375mg of Effexor daily, an "excessively high dose of a very potent anti-depressant." (Waite Dep. 24-25). The average daily dosage of Effexor is 150mg with 225mg being considered a high dosage. Id. Waite explained that Effexor counteracts depression or anxiety, but excessive doses of Effexor cause an activation syndrome, that is, overactivity, overstimulation, and impaired concentration. (Waite Dep. 31-32, 66).

At the same time Yerian referred Patel to Waite, he advised her to go to WSU's Office of Disability Service ("ODS"). (Patel Dep. 219). The same day she met with Waite for the first time, Patel met with Cassandra Mitchell at ODS. At the meeting, Mitchell "explained that ODS could not grant accommodations on her job but could discuss reasonable accommodations with her supervisor." (Patel Dep. Exh. 14). An ODS application for services form indicates Patel applied for services on June 21, 2006. (Patel Dep. Exh. 11). Patel scheduled a meeting with Mitchell for June 23 to discuss her documentation, but then cancelled the meeting. Patel returned to ODS on June 29, 2006, the same day she was dismissed from the internship program, and met with ODS Director Jeff

Vernooy. (Patel Dep. 221).

Prior to July 20, 2006, Patel provided Waite with an ODS certification form to complete. (Patel Dep. 223). On the form, Waite indicated Patel's "disability" would last six months. (Waite Dep. 104; Waite Dep. Exh. 14). By August 17, 2006, Patel reported that her attention difficulties "improved 50% since we reduced her Effexor," and Waite added Patel's "anxiety is greatly improved and only occurs intermittently." *Id.* Patel also met with Waite on August 29, 2006. (Waite Dep. Exh. 9). At this meeting, Patel explained childhood physical abuse problems with her parents attributed to her struggles at the School. As Patel phrased it, she equated her parents with "authority figures in her residency program." This resulted in the "transference" of her feelings of exhaustion and decreases in her attention span. *Id.*

On August 17, 2006, ODS received Patel's disability certification, completed by Waite. (Patel Dep. Exh. 12). The certification labeled Patel's disability as "severe attentional difficulties and organizational problems due to possible Bipolar Disorder…and Attention Deficit Hyperactivity Disorder." *Id.* Waite wrote that Patel was "unable to function adequately in her academic/clinical internship due to disorganization, inattention, mood instability (irritability, tearfulness, depression), inability to modulate her self in professional conversations, interrupting, self-reported decreased judgment, distractibility, and anxiety." *Id.* When asked if there were medications that Patel received that impacted her academic performance, Dr. Waite explained that one drug caused sedation and that a change of Patel's treatment could cause a worsening of symptoms such as destabilized mood. *Id.*

In August 2006, ODS conducted a pre-service interview with Patel. (Patel Dep. Exh. 9). The pre-service interview form indicated that Patel now suffered from ADD and major depressive disorder. Accordingly, ODS anticipated that Patel would need services including tutoring, additional time, a quiet room, and individual appointments to develop and maintain a work schedule. *Id.*

By September 13, 2006, Waite concluded that Patel suffered from a substance-induced mood

disorder, in addition to depression and ADHD. (Waite Dep. Exh. 10). Waite communicated these diagnoses to WSU on September 28, 2006. (Waite Dep. Exh. 11). In this same communication, Waite noted that Patel's "dysfunction" was "primarily due to prescription antidepressant-induced side effects." *Id.* Her disorder was due to "Effexor XR being prescribed for her at a dose above FDA recommendations." Any other dysfunction was "exacerbated by the above mentioned substance induced mood disorder." *Id*.

In the meantime, on July 20, 2006, Patel appealed her dismissal from the internship program. (Patel Dep. Exh. 17). The School formed an Appeals Committee and on October 3, 2006, the Committee held a hearing regarding Patel's dismissal. (McCarley Dep. Exh. E). The Committee reviewed documentation and heard testimony from Patel and Jeff Vernooy. (Patel Dep. Exh. 3).

After review, the committee sent a recommendation to Dr. La Pearl Logan Winfrey, Director of Clinical Training at the School. (McCarley Dep. Exh. E). The Committee found "that proper policy and procedure were followed through the point at which Ms. Patel's clinical supervisor (Dr. Steven Yerian) discussed her possible impairment and availed her to appropriate psychiatric intervention through Christina Waite." *Id*. However it was unclear whether Patel or Yerian spoke with anyone else about Patel's "impairment." Id. The committee recommended Patel's reinstatement and the formation of an Ad Hoc Student Impairment Committee. *Id*.

On November 30, 2006, Winfrey sent a letter to Patel explaining that pursuant to the Committee's recommendation, a follow-up/remediation committee was being formed to monitor and work with her on completing the internship. (McCarley Dep. Exh. F). The Internship Program would consider any accommodations formally requested by Patel and she was to submit these requests through ODS. *Id.*

On January 5, 2007, Patel accepted the formation of the remediation committee. (Patel Dep. Exh. 24). On January 26, 2007, she was notified that a Committee was formed consisting of Drs.

Ladle, Richard Koerner and Robert Rando. *Id.* She was again asked to seek approval from ODS for any accommodations she needed and provide that documentation to the School. *Id.* All she provided to the committee was a copy of her August 2006 ODS pre-service interview form (Patel Dep. Exhs. 19, 25).

On February 11, 2007, Patel met again with Waite. (Waite Dep. Exh. 12). This also marked the end point Waite had predicted for Patel's disability. (Waite Dep. Exh. 14). In fact, Waite determined that she had resolved Patel's problems long before this date. (Waite Dep. Exh. 15). Waite noted that she resolved Patel's inattention, hyperactivity, and anxiety, as well as Patel's impulsivity on November 29, 2006. Id. Patel's irritability had been resolved by August 29, 2006. *Id*.

On February 16, 2007, the School sent Patel a draft of a remediation plan and invited her to attend a February 21, 2007, meeting to review the plan. (Patel Dep. Exh. 26). Holly Wright-Brown from ODS attended the meeting with Patel, and Patel acknowledged that "accommodations" were discussed during this meeting. (Patel Dep. 267-68). Waite was aware that a remediation plan was being developed. (Waite Dep. 107-08). However, Waite offered no input into the plan and Patel did not request that Waite contact anyone to offer input. *Id.* Waite's only observation was that Patel was ready to re-enter the internship program "with appropriate mentoring." (Waite Dep. 104). Rando, Chair of the Remediation Committee, recalled presenting the plan to ODS for feedback. (Rando Dep. 24, 31-32). He felt it was relevant to get feedback from an ODS representative who would have been aware of Patel's "issues." (Rando Dep. 26-27).

The internship program professors met prior to Patel's re-entry and determined that Dr. Kathleen Malloy would serve as Patel's supervisor. (Malloy Dep. 8-9). Malloy was chosen because she was on sabbatical from the School during 2006 and could be the most objective. *Id.*

Patel signed a final version of the remediation plan on March 7, 2007. (Patel Dep. Exh. 27).

The plan outlined the steps necessary for Patel to complete her internship, including directives designed to track her attendance by signing in and out each day and keeping daily activity logs. The plan also required weekly evaluations of Patel from her immediate supervisor. *Id.* A rating of 2 (marginal/problematic) or lower on Patel's evaluation triggered a committee review of her internship status. If she failed to remedy a 2 or lower rating within one month she would be dismissed from the internship program. *Id.* The committee suggested that Patel use a daily planner and the services provided by ODS. Id. In addition, the School provided Patel an office in an inside hallway so she would not be disturbed by extraneous noise. (Malloy Dep. 32). Patel acknowledged that at the time she signed the plan, she felt it took her ADD into account. (Patel Dep. 291-92). In retrospect at the time of her deposition, Patel thought the plan should have offered her extra support and extra time. *Id.* However, Patel could not pinpoint what she needed extra time for, and even thought the program was supportive and helpful. (Patel Dep. 294, 303, 328).

On March 16, 2007, Patel reentered the internship program and returned to the General Practice Clinic to complete her second rotation. On April 4, 2007, the Remediation Committee met to review Patel's performance. (McCarley Dep. Exh. I). Present at the meeting were McCarley, Rando, Ladle, Koerner, Crystal Collier, Assistant GPC Director, and Patel. Drs. McCarley and Collier provided the committee with information of Patel's continued deficiencies. They reported she failed to contact assigned clients in a timely manner, was repeatedly late to work and meetings, and had not registered with the Ohio Psychology Board. *Id.*

On her April 12, 2007 evaluation Patel received a "2" rating. (Plaintiff's Exh. S). Patel continued to have problems "being on time". *Id.* On one occasion she was two hours late and on another occasion she was late by 20 minutes for a client appointment. (Plaintiff's Exh. S). Patel did not deny either instance of tardiness. (Patel Dep. 334-35).

Because of the receipt of a "2" on her performance evaluation, the Remediation Committee

convened on April 18, 2007, to review Patel's performance. (Plaintiff's Exh. J). Present were Drs. Victor McCarley, Crystal Collier, Kathleen Malloy, Robert Rando, Bruce Lade, Richard Koerner, and Ms. Patel. At the conclusion of the meeting Patel agreed to refrain from being late for any scheduled work time, meetings, and client sessions without prior notice of illness. *Id*.

Patel's May 10, 2007 evaluation included another "2" rating. (Plaintiff's Exh. W). In explaining this rating, Dr. Malloy noted that Patel arrived late for a client appointment. The client's name was not in the appointment book, which is against policy. Patel was aware of the policy as she had previously breached it. The situation was further complicated by Patel's request for testing materials after she was contacted by phone to see why she was late. According to policy, testing materials needed to be requested ahead of time, and such requests should also appear in the appointment book. *Id*.

Patel received "1" and "2" ratings on her May 23 evaluation. (Plaintiff's Exh. Y). On May 16, Patel failed to have three cases ready for staffing. (Exh. 37). According to internship policy, Patel had to staff all GPC cases within a week of completing a client's intake so that timely assignment and disposition could be made for each case. In one instance, Patel made a unilateral decision to assign a case to herself without seeking her supervisor's approval. Supervisory approval is important because all GPC cases belong to the supervisor, not the unlicensed intern. *Id*. Patel was also late for the May 16 meeting. She received an e-mail from Dr. Collier on May 17 warning her against being late for future team meetings. (Exh. 36). She was put on notice that continued tardiness could lead to a less than good rating on her performance evaluation. *Id*. Patel does not dispute being late. (Patel Dep. 339).

On May 18, Drs. Malloy and Collier conducted a chart review of selected GPC charts. In addition to one other intern, Patel's charts were selected for review. The review found several deficiencies in Patel's client charts, including (1) no indication that correspondence was sent to

clients despite being told to send a letter to these clients; (2) failure to document attempts at contacting clients via phone; (3) failure to document attempts at contacting a client for scheduling once a case had been transferred and assigned to her; (4) failure to prepare and have signed progress notes of sessions with clients; (5) failure to complete an intake form or intake summary in at least four separate cases. (Exh. 37).

On May 21, Patel again failed to place an appointment into the GPC appointment book. *Id.* Patel was also late for the appointment. *Id.* Patel does not dispute that she failed to put the client's name in the appointment book. (Patel Dep. 345-47).

The same day, Dr. Emmett Orr, Executive Director of the GPC, and Dr. Yerian, GPC Director, drafted a memo to Patel regarding her recent performance problems. (Exh. 37). Patel was notified that her clinical privileges were suspended effective immediately. Patel could not schedule, contact, or engage in any clinical activity with any client. She was given an opportunity to correct her chart deficiencies and submit her corrected charts to Dr. Collier on Friday, May 25, 2007, however. Once the deficiencies were corrected to the satisfaction of her clinical supervisor, her clinical privileges would be reinstated. Again, Patel was told that her failure to correct all deficiencies, failure to timely submit the charts to Dr. Collier, and failure to follow-up with her clinical supervisor would result in her dismissal from the internship. (Exh. 37).

Patel did not dispute that her charts needed to be organized, modified, or edited. (Patel Dep. 350). She also conceded that she was given enough time to correct the charts. (*Id.* at 354). Patel attempted to correct the deficiencies in her patient charts by the May 25 deadline, but could not recall if she corrected the charts "one hundred percent." (Patel Dep. 367).

In a memo to Patel on May 30, Drs. Orr and Yerian informed Patel that despite her efforts, significant deficiencies still existed in her client charts. In reviewing Patel's "corrected" charts, Drs. Malloy and Collier discovered that one case did not have an intake form or intake summary. More

troublesome were Patel's progress notes. Patel re-created progress notes from memory and dated the notes as if they had been written on the day of a session rather than the date the note was actually authored. Patel even included the re-created details of some cases on notes that did not correspond to the client's case, thus causing one client's protected client information to appear in another client's chart. (Exh. 41). In addition, Patel saw a particular client on at least two occasions without her supervisor's knowledge. An entry in one chart indicated that Patel made a unilateral decision to stop the assessment of a client without her supervisor's knowledge. *Id.*

Following Patel's receipt of "1" and "2" ratings, the Remediation Committee met on May 30, 2007. (Plaintiff's Exh. H). The committee reviewed documentation of the incidents that occurred throughout May 2007 and reached the same conclusion that Drs. McCarley, Malloy, and Collier had. Malloy expressed concerns that Patel was dishonest because Patel would tell her patient charts were being completed, but when Malloy checked the charts nothing had been done. (Malloy Dep. 23-24, 26). Malloy noted that the goal of the internship is to get the interns to a point where they are able to practice on their own without supervision. Id. at 34. Thus, Patel needed to be able to carry a clinical caseload and develop her skills in therapy and assessment. Id. This same reasoning led Dr. McCarley to conclude that Patel was "clinically deficient". (McCarley Dep. 58).

The committee recommended Patel's dismissal from the internship program and on May 31, 2007, McCarley sent her a letter notifying her of the Remediation Committee's unanimous decision to dismiss her from the internship program. (Plaintiff's Exh. O).  The next day Patel visited ODS and met with Holly Wright-Brown. (Exh. 46). Patel scheduled a subsequent appointment on June 5, 2007, but called to cancel. She rescheduled for June 15, 2007, but did not call or show up for the appointment. *Id.*

On or about July 5, 2007, Patel appealed her dismissal. (Exh. 44). A Grievance/Termination Appeal Committee was formed consisting of Drs. Sarah Fillingame, Richard Koerner and Leon

VandeCreek, with Dr. VandeCreek designated as chair. *Id.* The committee never convened because this suit was filed July 13, 2007.

**Analysis**

The relevant pleading for analysis is Plaintiff's First Amended Complaint (Doc. No. 18). In its she names as Defendants Wright State University's School of Professional Psychology[3], Victor McCarley, Robert Rando, Kathleen Malloy, and John Rudisill. The individual Defendants are all members of the faculty of the School of Professional Psychology (the "School") and are sued for their roles in the decision to terminate Plaintiff from the School's pre-doctoral internship program.

Plaintiff pleads the following claims for relief:

**First claim:** discrimination and retaliation against Plaintiff because of her East Asian ethnicity in violation of Ohio Revised Code § 4112.02 (Amended Complaint, Doc. No. 18, at ¶¶ 25-27).

**Second claim:** deprivation of substantive and procedural due process rights protected by the Fourteenth Amendment with the cause of action arising under 42 U.S.C. § 1983. (Amended Complaint, Doc. No. 18, at ¶¶ 28-29).

**Third claim:** violation of § 504 of the Rehabilitation Act. (Amended Complaint, Doc. No. 18, at ¶¶ 30-31).

**Fourth claim**: violation of the Americans with Disabilities Act. (Amended Complaint, Doc. No. 18, at ¶¶ 32-33).

_____

[3]The School of Psychology is not separately organized from the University and the parties recognize that suit is against the University.

**Fifth claim:** violation of Ohio Revised Code § 4112.02 arising from all the acts pled in ¶¶ 1-33. (Amended Complaint, Doc. No. 18, at ¶¶ 34-35).

The Court has subject matter jurisdiction over the Second, Third, and Fourth Claims under 28 U.S.C. § 1331 and over the First and Fifth Claims, which are part of the same case or controversy, under 28 U.S.C. § 1367.

## Conceded Claims

At the outset of her Memorandum Contra Defendant's [sic] Motion for Summary Judgment, Plaintiff writes:

> As a preliminary matter Plaintiff concedes that her claims under the American's with Disabilities Act and Ohio law are barred by the Eleventh Amendment and that there is insufficient evidence in the record to support her claims of a hostile environment and discrimination due to her ethnic background as an East Asian American.

(Memorandum, Doc. No. 41, at 1.)

**Eleventh Amendment:**

The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.

It has been construed to bar suits against a State by its own citizens. *Papasan v. Allain,* 478 U.S. 265, 276, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986); *Hans v. Louisiana*, 134 U.S. 1, 10 S. Ct. 504, 33 L. Ed. 2d 840 (1890); *Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974);

*Florida Dep't. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102 S. Ct. 3304, 73 L. Ed. 2d 1057 (1982). The Amendment also bars actions against state agencies where the State is the real party in interest and the action seeks to recover money from the state treasury. *Estate of Ritter v. University of Michigan,* 851 F.2d 846, 848 (6th Cir. 1988); *Ford Motor Company v. Dep't. of Treasury of State of Indiana*, 323 U.S. 459, 65 S. Ct. 347, 89 L. Ed. 2d 389 (1945); *Quern v. Jordan*, 440 U.S. 332, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979).

Application of the Eleventh Amendment in a suit against a public agency turns on whether the agency can be characterized as an arm or alter ego of the State, or whether it should be treated instead as a political subdivision of the State. *Hall v. Medical College of Ohio at Toledo,* 742 F.2d 299, 302 (6th Cir. 1984)(citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280 (1977)). Wright State University is created directly by Ohio statute and is thus an arm of the State of Ohio, protected from suit in federal court unless Congress has validly abrogated the bar of the Amendment under its enforcement power in § 5 of the Fourteenth Amendment. This bar against suit also extends to state officials acting in their official capacities. *Kentucky v. Graham,* 473 U.S. 159, 167 (1985).

Plaintiff does not relate her concession to particular claims for relief. The Court concludes that, by virtue of the Eleventh Amendment, it lacks subject matter jurisdiction of Plaintiff's First and Fifth Claims for Relief as against Wright State University and against the individual Defendants in their official capacities.

In her Fourth Claim for relief, Plaintiff asserts a violation of the Americans with Disabilities Act without specifying the title of that Act under which she is suing. As to any claims for money made under Title I of the ADA against Wright State, including claims against the individual defendants in their official capacities, those Defendants are immune from suit under the Eleventh

Amendment. *Carten v. Kent State University,* 282 F.3d 391 (6th Cir. 2002), citing *Bd. of Trustees v. Garrett,* 531 U.S. 356 (2001). Under *Carten*, claims for injunctive relief against Wright State under Title II of the ADA are barred by the Eleventh Amendment, but not injunctive relief claims against the individual Defendants in their official capacities. *Id*. at 395, relying on *Ex Parte Young*, 209 U.S. 123 (1908)

Congress has also not abrogated the Eleventh Amendment immunity of the States under 42 U.S.C. § 1983. *Cowan v. University of Louisville School of Medicine*, 900 F.2d 936, 940-41 (6th Cir. 1990)(citing *Quern v. Jordan,* 440 U.S. at 341.) Therefore the Second Claim for Relief must be dismissed for lack of subject matter jurisdiction as to Wright State and as to the individual Defendants in their official capacities.

**Ethnicity Discrimination:**

As to the individual Defendants in their individual capacities, Plaintiff concedes that she has insufficient evidence of ethnic origin discrimination. Therefore the individual Defendants are entitled to summary judgment on the First Claim for Relief, dismissing that claim with prejudice. To the extent the Second Claim for Relief can be read as alleging that the individual Defendants discriminated against Plaintiff on the basis of her ethnicity, they are entitled to summary judgment. Likewise, the individual Defendants in their individual capacities are immune from liability to Plaintiff on her Fifth Claim for Relief. Ohio Revised Code §§ 9.86, 2743.02F); *Haynes v. Marshall*, 887 F. 2d 700, 704 (6th Cir. 1989).

**Individual Defendants as Employers or Public Entities:**

The term "employer" under Title I of the Americans with Disabilities Act has the same

meaning as that term in Title VII of the 1964 Civil Rights Act. *Mitchell v. Chapman,* 343 F. 3d 811 (6th Cir. 2003). That is also true of the Rehabilitation Act. *Hiler v. Brown,* 177 F. 3d 542 (6th Cir. 1999). A supervisor is not an employer under Title VII. *Wathen v. General Electric Co.,* 115 F.3d 400, 406, (6th Cir. 1997). Therefore the individual Defendants in their individual capacities cannot be liable to Plaintiff under either the Title I of ADA or the Rehabilitation Act and those claims as made in the Third and Fourth Claims for Relief must be dismissed.

Plaintiff contends that she has viable claims against the individual Defendants under Title II of the ADA and under the Rehabilitation Act, relying on *Carten, supra*, and *Nelson v. Miller*, 170 F.3d 641 (6th Cir. 1999) The Court agrees insofar as Plaintiff seeks injunctive relief. However, neither case intimates that supervising employees of public entities can be held liable for money damages under either Act. Indeed, only injunctive relief was sought in *Nelson*. *See also Sullivan v. River Valley School Dist.*, 197 F.3d 804, 808 n. 1 (6th Cir. 1999).

**Qualified Immunity Under 42 U.S.C. § 1983:**

The individual Defendants in their individual capacities claim they are qualifiedly immune from any liability under 42 U.S.C. § 1983.

Government officials performing discretionary functions are afforded a qualified immunity under 42 U.S.C. §1983 as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir., 1994); *Flatford v. City of Monroe*, 17 F.3d 162 (6th Cir. 1994).

Qualified immunity analysis involves three inquiries: (i) "whether, based upon the applicable

law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred;" (ii) "whether the violation involved a clearly established constitutional right of which a reasonable person would have known;" and (iii) "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005), *quoting Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). Qualified immunity must be granted if the plaintiff cannot establish each of these elements. *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 636 (6th Cir. 2004).

In deciding qualified immunity questions, district courts were for some years required to apply a two-part sequential analysis, first determining whether the alleged facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right, and then deciding if the right was clearly established at the time the officer acted. *Brosseau v. Haugen*, 543 U.S. 194 (2004), *Estate of Carter v. City of Detroit,* 408 F.3d 305, 310-11 (6th Cir. 2005), and *Klein v . Long,* 275 F.3d 544 (6th Cir. 2001), *both citing Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, the two-step process is no longer mandated in light of experience with its use; trial judges are now permitted to use their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. *Pearson v. Callahan*, 556 U.S. ___, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

In order for the violated right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right; in light of pre-existing law, the unlawfulness of the official's action must be apparent. *Anderson v. Creighton*, 483 U.S. at 640. The right must be defined at the appropriate level of specificity to determine whether it was clearly established at the time the defendants acted. *Wilson*

*v. Layne*, 526 U.S. 603, 615 (1999), citing *Anderson v. Creighton.* The test is whether the law was clear in relation to the specific facts confronting the public official when he acted; the constitutional right must not be characterized too broadly without considering the specific facts of the case. *Guercio v. Brody*, 911 F.2d 1179 (6th Cir. 1990). The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir. 1992). Although the very action in question need not have previously been held unlawful, its unlawfulness must be apparent in light of pre-existing law. *Id.* An action's unlawfulness can be apparent from direct holdings, specific examples described as prohibited, or from the general reasoning that a court employs. *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002), citing *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2516-17, 153 L.Ed.2d 666 (2002).

Ordinarily, "clearly established law" means binding precedent of United States Supreme Court, the Sixth Circuit Court of Appeals, the Ohio Supreme Court, or the deciding court itself. *Bush v. Rauch,* 38 F.3d 842, 847 (6th Cir. 1994); *Wegener v. Covington,* 933 F.2d 390 (6th Cir. 1991); *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988); *Davis v. Holly*, 835 F.2d 1175, 1180 (6th Cir. 1987); *Robinson v. Bibb*, 840 F.2d 349, 352 (6th Cir. 1988); or case law from other circuits which is directly on point. *Barrett v. Harrington,* 130 F.3d 246, 264 (6th Cir. 1997)(citing *Cameron v. Seitz*, 38 F.3d 264, 272-73 (6th Cir. 1994).

This Court elects to decide the "clearly established" prong first. Plaintiff has pointed to no law which clearly establishes that any act of any of the individual Defendants violated any constitutional right of the Plaintiff. In particular, Plaintiff has cited no law to the effect that failure by one or more of the individual Defendants to follow any Wright State internal policy or handbook deprived Plaintiff of a due process right. Failure to abide by state law is not itself a constitutional

violation. *Roberts v. City of Troy*, 773 F.2d 720 (6th Cir. 1985). Violation by a State of its own procedural rules does not necessarily constitute a violation of due process. *Bates v. Sponberg*, 547 F.2d 325 (6th Cir. 1976); *Ryan v. Aurora City Bd. of Educ.*, 540 F.2d 222, 228 (6th Cir. 1976). "A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result on the constitutionalizing of every state rule, and would not be administrable." *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir.1993). Officials do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision. *Davis v. Scherer*, 468 U.S. 183, 194 (1984). The individual Defendants are entitled to qualified immunity from any claims under 42 U.S.C. § 1983.

**Rehabilitation Act:**

The parties are in agreement that Wright State has waived its Eleventh Amendment immunity from suit under the Rehabilitation Act by accepting federal funds. *Nihiser v. Ohio EPA,* 269 F.3d 626, 628 (6th Cir. 2001). Thus on this claim the Court must determine whether the factual record developed on discovery includes sufficient facts to preclude judgment as a matter of law for the Defendants.

To establish a claim that she was dismissed from WSU in violation of the ADA or the Rehabilitation Act, Plaintiff must show: 1) that she is handicapped or disabled as defined by each statute; 2) that she is "otherwise qualified" to continue in the School; and, 3) that she was dismissed from the school on the basis of her handicap or disability. *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997); *see also Wong v. Regents of the Univ. of Cal.* 192 F.3d 807 (9th Cir. 1999), cited by Plaintiff at Memorandum Contra, Doc. No. 41, at 3.

**Is Plaintiff Disabled?**

A disability for purposes of this case is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of the individual." 42 U.S.C. § 12102(a). To be substantially limited, an individual must be unable to perform a major life activity that the average person can perform, or significantly restricted in terms of the condition, manner or duration of performing a major life activity. 29 C.F.R. § 1630.2(j)(1). Major life activities include self-care, walking, seeing, hearing, speaking, breathing, learning and working. 29 C.F.R. § 1630.2(i).

Plaintiff was diagnosed with depression approximately fifteen years ago by a clinical psychologist and was taking a very large dose of an antidepressant at the time she entered the Internship Program. However, she is not claiming the depression as a disability[4], but instead that she is disabled by attention deficit disorder ("ADD") or attention deficit-hyperactivity disorder ("ADHD")(Patel Depo. at 45-46). Dr. Waite diagnosed Ms. Patel with these two disorders (which she said were the same thing) after beginning to see Ms. Patel in June, 2006. The Sixth Circuit has accepted that ADHD can be an impairment. *Knapp v. City of Columbus*, 2006 U.S. App. LEXIS 17081 (6th Cir. July 6, 2006).

A mere diagnosis, however, does not prove an impairment. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 193-94 (2002); *Myers v. Cuyahoga County,* 182 F. App'x 510, 516 (6th Cir. May 31, 2006). An impairment must be permanent or long-term to qualify as a disability.

---

[4]The discussion of depression as an impairment in Plaintiff's Memorandum Contra at p. 4 is thus directly contradictory to Plaintiff's disclaimer at her deposition of any reliance on depression as an impairment.

*Williams*, 534 U.S. at 197. In addition, an impairment must not be capable of mitigation through corrective measures to qualify as a disability. *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483 (1999). Any impairment must be evaluated "in its medicated – and thus substantially controlled – state." *Cotter v. Ajilon Serv., Inc*., 287 F.3d 593, 598-99 (6th Cir. 2002).

The record establishes that Plaintiff had behaviors which are often displayed by persons suffering from ADHD: extreme difficulty concentrating, remaining attentive, arriving at work and meetings on time, and organizing and setting priorities which would allow her to complete assignments on time. (Memorandum Contra at 5, citing Waite Depo. at 19.) Defendants argue that Ms. Patel's limitations were not long-term in that she had never sought therapy prior to enrolling in the Internship Program and admits her ADD-ADHD symptoms prior to that time were "off and on" at most (Patel Depo. at 55).

During her first rotation, Ms. Patel did not seek the assistance of WSU's Office of Disability Services ("ODS") at any point, nor did she communicate the difficulties she was experiencing in her rotation to any WSU personnel. (Patel Dep. 102-03). She did not tell McCarley about her diagnosis of ADD or her prescribed medications. (Patel Dep. 112, 117). After her first six-month rotation at Miami Valley, Patel did not consider herself to be a person with a disability. (Patel Dep. 123).

Even after she was placed on probation at the Ellis Institute on March 16, 2006, she did not contact the ODS and did not consider herself a disabled individual in any way. (Patel Dep. 162-63). Prior to June 21, 2006, which was the first time Patel met with a representative from the ODS, she resisted being "labeled" as an individual with a disability and she was hesitant to visit the ODS. (Patel Dep. 183-84). The first time Patel ever raised her diagnosis to McCarley was the day she was terminated from the Ellis Institute rotation. (Patel Dep. 213).

Prior to her reinstatement into the internship program, Patel interviewed with the ODS in

August, 2006, and was certified as an individual who was eligible for the ODS' services. (Patel Dep. 253-54; Patel Dep. Exh. 19). Further, Waite submitted a letter to the School detailing her care of Patel from June 14, 2006, to September 28, 2006. (Patel Dep. Exh. 21). Waite attributed Patel's "dysfunction primarily to prescription antidepressant-induced side effects." *Id.* As Waite testified, Patel was on "an excessively high doses (sic) of a very potent antidepressant, which far exceeded the recommended dosage." (Waite Dep. 24). Waite went on to testify that Patel's main problem was her "overstimulation from Effexor" and that Patel's ADHD must be "fairly under control" given her academic progress. (Waite Dep. 49-50). Once Waite reduced Patel's dosage of Effexor, Patel experienced "dramatic improvement." (Waite Dep. 86-87).

Waite felt that once she reduced Patel's Effexor, she would have functioned "more than adequately" in the internship program "given a supportive environment." (Waite Dep. 89-90). Once Waite was able to arrive at the correct combination of medications, she felt Patel's ADHD was under control and Patel was ready to reenter the program as of March 1, 2007. (Waite Dep. 97). Patel agreed with Waite. *Id.*

When the record is read most favorably to Ms. Patel, it shows that she had no impairment which she was willing to recognize as limiting her prior to the time she was first terminated from the Internship Program. At that time she apparently recognized how much impact the symptoms were making on her life. She accepted a referral to Dr. Waite who diagnosed her with ADD-ADHD primarily stemming from a serious overdose of an antidepressant. Even assuming that some of her ADD-ADHD symptoms stemmed from an additional cause as well, Dr. Waite believed the symptoms were brought under control by reducing the Effexor dosage; there is no record reference which has been called to the Court's attention of any medication prescribed directly for the ADD-ADHD, such as Ritalin.

27

If the symptoms of the disability could be controlled by medication or reducing the side effects of medication, it is does not qualify as a disability under the ADA or Rehabilitation Act. *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999).

Ms. Patel makes the argument that, in contrast to being a person with a disability, she could be classified as a person with a record of a disability or as a person regarded as having a disability. Memorandum Contra, Doc. No. 41, at 5-6. This argument ignores the fact that at the time she became a "person with a record of a disability," i.e., the time when Dr. Waite gave her opinion that Ms. Patel was ready to reenter the program, the School accepted that recommendation. That is, they readmitted her even though she was a "person with a record of a disability." And plainly a plaintiff cannot take the position that she is both a disabled person who requires an accommodation and also that she is not a disabled person but is wrongly so regarded and discriminated against on that basis.

Plaintiff claims that her major life activities which were significantly restricted by her ADHD are learning and working. Something made her sufficiently distracted from her internship that she failed to perform satisfactorily in two different clinical settings during her first admission to the program. Whatever it was had not prevented her from successfully completing an undergraduate degree and the classwork for her doctorate and did not later prevent her from writing and defending her dissertation. Clearly, then, the symptoms were not permanent. The only professional evaluation of record is that the symptoms were caused by serious overdosing on Effexor and were substantially eliminated by removing that drug from her system.

**Reasonable Accommodation:**

Plaintiff claims that her disability was not reasonably accommodated.

Once it was aware of her diagnosis, Wright State essentially excused her failures during the

first internship year, revoked her termination, and readmitted her.  She had been referred to Dr. Waite by Dr. Yerian and the School accepted Dr. Waite's recommendations about accommodating her, including readmitting her to the program, giving her a supervisor, giving her a quiet inside office, and making other suggestions about how to deal with the problems she had experienced (e.g., deal with disorganization and lack of timeliness by using a daily planner.)  So far as the record shows, Ms. Patel never requested any accommodation beyond these.

In her motion papers, she complains that the School has a handbook about dealing with student impairments which it did not follow in dealing with her.  Yet she never points to any request that the handbook be followed or any complaint that it was not, or any accommodation in the handbook which would have fulfilled her need for something more.  At her deposition she complained that the remediation program, the outline of the accommodation which was given her, was too strict or rigid, but she does not identify any of the program requirements which she failed to meet as somehow arbitrary or not reasonably necessary to the professional working life of a clinical psychologist.  She identifies various ways in which Drs. Rando and Malloy might have known more about her situation or about the general policies of Wright State for dealing with impaired students, but she does not even suggest any way in which any of those claimed deficiencies contributed to her failure to meet the program requirements on her second admission.

Plaintiff argues in the alternative that she was subjected to retaliation in that she engaged in protected activity by appealing her dismissal and was retaliated against by not having her disability accommodated.  That is a spin on the facts which will not fly.  Instead of retaliating against her for appealing, the School essentially sustained the appeal then reinstated her with all of the accommodations she had requested.  Even with those accommodations, she was unable to meet the reasonable requirements of the internship program; she has never suggested that the requirements

imposed on her were more onerous than those imposed on others or were not reasonably related to her training.

Even with the accommodation and with the treatment with Dr. Waite which "dramatically improved" her ADD-ADHD symptoms, Ms. Patel was unable to meet the program requirements. She was thus not "otherwise qualified" for the Internship Program.

## Conclusion

There are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law. Plaintiff's Motion for Summary Judgment is denied. Defendants' Motion for Summary Judgment is granted. The Clerk will enter judgment dismissing the First Amended Complaint with prejudice.

May 22, 2009.

s/ **Michael R. Merz**
United States Magistrate Judge